# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAWARMA STACKZ LLC,<br><br>                           Plaintiff,<br><br>    v.<br><br>JAY JWAD, *et al.*,<br><br>                      Defendants. | Case No. 21-cv-01263-BAS-BGS<br><br>**ORDER:**<br><br>**(1) DENYING DEFENDANTS' MOTION TO DISMISS FOR LACK OF JURISDICTION (ECF No. 6); AND**<br><br>**(2) GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (ECF No. 7)** |

This action arises from the negotiation and subsequent breach of a franchise agreement for restaurants selling Middle Eastern dishes. Plaintiff Shawarma Stackz LLC ("SSL") sued Defendants Vision Global Entertainment Corp. ("VGEC") and its Chief Executive Officer Jay Jwad, who are both Florida residents. According to SSL, VGEC and Jay have been operating a restaurant in Miami that has used SSL's trademark without permission.

Defendants move under Federal Rule of Civil Procedure 12(b)(2) to dismiss the action for lack of personal jurisdiction. (ECF No. 6.) Plaintiffs separately move for

preliminary injunction and ask that the Court enjoin Defendants from operating the Miami Restaurant, among others.  (ECF No. 7.)  Because the Court finds a *prima facie* case for exercising specific personal jurisdiction over both Defendants, the Court **DENIES** Defendants' motion to dismiss the action.  (ECF No. 6.)  The Court **GRANTS** SSL's motion for preliminary injunction, finding that SSL has met all four factors of the *Winter* test applicable to a motion for preliminary injunction.  (ECF No. 7.)

# BACKGROUND

## I.   Factual Background

### A.   The Parties

Plaintiff SSL is a California limited liability corporation, with its principal place of business located in San Diego, California.  (Compl. ¶ 1.)  SSL franchises a Middle Eastern street food restaurant.  (*Id*.)  SSL and its parent company, Tahini LLC, own and operate a Middle Eastern restaurant named "Tahini Restaurant" in San Diego.  (*Id.* ¶ 8.)  Tahini LLC and SSL are owned by non-parties, Osama Shabaik and Mahmoud Barkawi.

Defendant Jay Jwad is a resident of Florida, and Defendant VGEC is a Florida corporation.  (*Id.* ¶¶ 3–4.)  Jay is VGEC's chief executive officer, and non-party, Hussam "Sam" Jawad is VGEC's chief operating officer.  (*Id.* ¶ 4.)  Hussam and Jay are brothers.

### B.   The Franchise Agreement

Starting in 2018, Hussam frequented Tahini Restaurant as a customer.  (Compl. ¶ 9.)  Hussam approached Shabaik and Barkawi about opening a Tahini-branded franchise restaurant in Miami, Florida.  (*Id.*)  Tahini's ownership negotiated a franchise agreement with Hussam and developed a franchise brand, "Shawarma Stackz," expecting VGEC, Hussam, and Jay to be the first franchisees.  (*Id.*)  The Tahini ownership incorporated SSL, registered the domain name <shawarmastackz.com>, created a franchise disclosure document ("FDD"), wrote a restaurant operation manual, and designed the Shawarma Stackz mark and brand.  (*Id.*)  The mark and brand included logo, uniforms, menu design,

website, and social media.  (*Id.*)  The "Shawarma Stackz" trade name, trademarks, service marks, logos, and related trade dress (the "Marks") that Tahini owns include the stylized service mark "SHA WAR MA STACKZ," which is the subject of Tahini's pending federal application for U.S. Serial No. 88856142.  (*Id.* ¶ 32.)  In addition, the Marks include "other Shawarma Stackz brand collateral, including but not limited to distinctive logos, menus, signage, and employee uniforms."  (*Id.* ¶ 33.)

On December 16, 2019, SSL issued the FDD, which included a franchise agreement ("the Agreement"), and presented it to Hussam.  (Compl. ¶ 10.)  Shabaik signed the Agreement on behalf of SSL on December 18, 2019.  (*Id.*)  On February 9, 2020, Hussam signed the Agreement in his individual capacity.  (*Id.*)

The Agreement was to be in effect for ten years after the franchise restaurant first opened for business.  (Agreement § 3.1, ECF No. 1-2 at 93.)  The Agreement authorized Hussam to own and operate a Shawarma-Stackz-branded franchise restaurant in Miami, Florida.  (Compl. ¶ 10; Agreement Ex. FA-1(A), ECF No. 1-2 at 157.)  Under the Agreement, the franchisee was to pay SSL a "Continuing Royalty Fee" amounting to six percent of the franchisee's gross sales on a biweekly basis.  (Agreement §§ 5.2, 5.7, ECF No. 1-2 at 97–98.)

The FDD required Hussam to give SSL "independent access to information [he] generate[s] and store[s] on [his] [point-of-sale] system[,]" in order to give SSL information without any contractual limitation on the access or use of the information.  (FDD at 30, ECF No. 1-2 at 63.)  The Agreement also required Hussam to "allow Franchisor to poll on a daily basis, at a time selected by Franchisor, [the] computerized [point-of-sale ("POS")] system for the Restaurant to retrieve sales, usage, and operations data." (Agreement § 10.1.A., ECF No. 1-2 at 123.)

The Agreement expressly allowed SSL to terminate the Agreement with notice where Hussam is "in default under the terms of [the] Agreement and the default [is not] . . . cured or remedied (to [SSL]'s satisfaction) within thirty (30) days after receipt of written notice from [SSL][.]"  (*Id.* § 15.2.B., ECF No. 1-2 at 140–41.)  The Agreement deemed a

franchisee to be in default when, among others: the "[f]ranchisee fails to comply with any provision of this Agreement that does not otherwise provide for immediate termination, or [f]ranchisee's bad faith in carrying out the terms of this Agreement"; or when the "[f]ranchisee fails to maintain and operate the Restaurant in accordance with any provisions, specifications, methods, standards or procedures prescribed by Franchisor for the System, including, but not limited to, complying with the provisions of this Agreement, the Manual and other written materials[.]" (*Id.* § 15.2.B.(c). & (o)., ECF No. 1-2 at 141–42.)

In addition, the Agreement allowed SSL to terminate the Agreement immediately, without providing the franchisee an opportunity to cure, when:

> Franchisee or any partner, member or shareholder in Franchisee makes, purports to make or attempts to make an unauthorized direct or indirect transfer of this Agreement or any rights or obligations under this Agreement, or makes, purports to make or attempts to make an unauthorized direct or indirect transfer of an ownership interest in the Franchise[.]

(Agreement § 15.2.A.(g)., ECF No. 1-2 at 139.)

Once the franchise is terminated, the Agreement provides that the franchisee will "immediately and permanently discontinue operation of the Restaurant and any use of the intellectual property and/or the Confidential Information owned by Franchisor, and will not use any similar or derivative marks, or materials, or colorable imitations of any such intellectual property in any medium or manner or for any purpose." (Agreement § 15.6.C., ECF No. 1-2 at 143.)

### C.    The Miami Restaurant and the Alleged Breach of the Agreement

At some point in 2018–19, Hussam entered into a lease at 241 NW 24th St., Miami, FL 33127 for the operation of the franchise restaurant ("Miami Restaurant"). (Compl. ¶ 11.) Hussam made tenant improvements to the leased premises. (*Id.* ¶ 12.) Subsequently, SSL provided an eleven-week training for Hussam, Jay, and the staff of the Miami Restaurant: in Miami, from March 8 to March 22, 2020; in San Diego, from April

22 to May 15, 2020; and in Miami, from May 25 to July 6, 2020.  (*Id.*)  The scope of the training included: "recipes and methods of cooking and food preparation, understanding of Shawarma Stackz methodologies and best practices, proper use of equipment, customer interactions, hiring, onboarding, and employee relations, staff scheduling, ordering and vendor relations."  (*Id.*)

The Miami Restaurant went into business on or around June 10, 2020.  (Compl. ¶ 13.)  Soon after, Hussam cut off all communications with SSL.  (*Id.*)  Hussam did not pay SSL the invoiced costs of training activities amounting to at least $14,791.96.  (*Id.* ¶ 14.)  In addition, Hussam did not remit SSL royalty fees and revoked SSL's access to the POS system (Toast) and delivery platforms (UberEats, GrubHub, and DoorDash), preventing SSL from viewing sales data calculating royalty fees.  (*Id.* ¶ 15.)  On or around August 14, 2020, SSL obtained access to the Miami Restaurant's POS system through the third-party vendor, Toast, and calculated Hussam's unpaid royalties as of September 6, 2020, to be $7,430.76.  (*Id.*)  SSL estimates the unpaid royalties due now to be "many multiples" of that amount.  (*Id.*)

### D.    SSL's Letters to Hussam

On a letter addressed to "Sam Jawad," dated August 7, 2020, SSL notified Hussam of his breach of the Agreement and SSL's intent to terminate the Agreement in the event Hussam does not cure the breach.  (ECF No. 1-3.)  The letter stated that Hussam breached the Agreement in three aspects: by (1) making an unauthorized transfer of the franchise, (2) failing to fulfill the financial obligations under the Agreement, and (3) revoking SSL's access to the Miami Restaurant's electronic systems.

First, SSL's letter noted that Hussam attempted to transfer the Agreement to his brother, Jay Jwad, by writing to SSL on July 21, 2020, the following: "I am no longer working for the business. Please contact Jay for further requests. I suggest you talk with Jay to resolve any outstanding issues . . . ."  (ECF No. 1-3 at 2.)  SSL gave Hussam an option to cure this default by confirming in writing on or before August 12, 2020, that he

has not transferred the Agreement or the Franchise in violation of Section 15.2.A(g) of the agreement.  (*Id.* at 3.)

Second, SSL's letter notified Hussam that he was past-due on "Invoice 8425, dated 07.10.2020, in the amount of $14,791.96" and "Invoice 8589, dated 07.13.2020, in the amount of $194.10."  (*Id.* at 3.)  The letter also notified Hussam that he failed to remit royalties for the operation of the Miami Restaurant in violation of Sections 5.2 and 5.7 of the Agreement.  (*Id.*)

Third, the letter stated that Hussam improperly revoked SSL's access to the Miami Restaurant's POS system and failed to provide SSL access to the third-party delivery platforms including UberEats, GrubHub, and DoorDash, in violation of Section 10.1.A. of the Agreement.  (*Id.*)

Hussam never responded to the August 7, 2020 letter.  On August 13, 2020, SSL sent a second letter to Hussam, notifying him of the termination of the Agreement and the consequences of the termination.   (ECF No. 1-6.)  The letter notified Hussam that he has a duty to "[i]mmediately and permanently discontinue operation of the Restaurant and any use of Franchisor's intellectual property and Confidential Information," including "removal of all Shawarma Stackz signage and branding[.]" (*Id.* at 3.)  The letter also stated that SSL received a suspicious email on August 8, 2020, the day after SSL sent a letter notifying Hussam of the breach of the Agreement, presumably "threatening to expose [SSL]'s trade secrets as a means of intimidating [SSL] from exercising its rights under the Agreement." (*Id.* at 3–4.)[1]

//

//

_____

[1] SSL attaches a screenshot of an email as Exhibit D to its Complaint.  (ECF No. 1-5.)  The sender of the email is "Tahini StreetFood <tahinistreetfood@gmail.com>."  (*Id.*)  The email states "[d]oes this ring a bell? Better for everyone to walk away and never look back," along with a list of several spices. (*Id.*)

### E. Arbitration and Hussam's Bankruptcy

SSL initiated an arbitration proceeding on September 9, 2020, after Hussam did not respond to SSL's proposals to conduct a pre-arbitration mediation. (Compl. ¶ 25.) On September 29, 2020, a user with the account name "Cheif E." posted the recipe for one of SSL's spice blends on Tahini's Yelp page, along with the remark that "[a]nybody interested in the spice you can use in good Shawarma, I have it for the steak . . . I will post more on my insta[gram] and snapchat account soon!" (*Id.* ¶ 26.) Yelp deleted that post upon SSL's request. (*Id.*) The next day, "Cheif E." again posted the recipe on Tahini's Yelp page with the following statement: "I am interested in working in restaurants in the area to provide amazing shawarma, Falafel and sauces spice mix and other restaurant consulting support[.] Simsim restaurant in the area one of my client [sic]." (*Id.*) SSL alleges that Hussam was aware that the steak spice blend gave SSL competitive advantage and that Simsim restaurant owners had told SSL's shareholder, Barkawi, that they could not match the taste of Tahini's steak shawarma. (*Id.* ¶ 27.) In addition, SSL alleges that Hussam and Jay were the only people outside of SSL or Tahini organization who had access to SSL's proprietary recipe information. (*Id.*)

In response to the posts on Yelp, SSL moved for emergency relief in the arbitration, and the arbitrator issued the first interim award that enjoined Hussam and his agents from disseminating SSL's confidential information. (Compl. ¶ 28.) Subsequently, the arbitrator issued two more interim awards in SSL's favor and awarded SSL attorney's fees and arbitration costs. (*Id.* ¶¶ 29–30.) Hussam has not paid his share of the arbitration fees. (*Id.* ¶ 31.)

On January 6, 2021, Hussam filed a voluntary petition for bankruptcy under Chapter 7, Title 11 of the United States Code, initiating the following bankruptcy proceeding: *In re Jawad*, 21-00014-LA7 (Bankr. S.D. Cal.). The proceeding resulted in discharge of Hussam's debt. United States Trustee filed an adversary action objecting to the discharge, and the adversary action is currently pending before the U.S. Bankruptcy Court for the Southern District of Texas. *In re Jawad*, 21-90048-LA (Bankr. S.D. Cal.).

21cv1263

### F.   Continued Operation of the Miami Restaurant

Hussam, Jay, or VGEC continues to operate the Miami Restaurant.  (Compl. ¶ 37.)  In late 2020, SSL shut down the Miami Restaurant's Instagram account that used SSL's Marks.  (*Id.* ¶ 38.)  Afterwards, the Miami Restaurant's name has been modified from "Shawarma Stackz" to "The Stackz Shawarma House," and the logo, signage, and menu have been modified.  (*Id.* ¶ 39.)  SSL alleges that the modified logo, signage, and menu are knockoff versions of SSL's Marks which continue to infringe on its intellectual property.  (*Id.* ¶¶ 37–41.)  According to the Complaint, the Restaurant continues to use SSL's recipe.  (*Id.* ¶ 46.)

SSL alleges that Hussam "is the owner of the Restaurant" but has "falsely claim[ed]" that Jay and/or VGEC own the Restaurant.  (*Id.* ¶ 47.)  According to SSL, "Hussam has no documentation of any asset transfer, and evidence gathered by SSL shows Hussam's continuous involvement in, and control over, the Restaurant's operations up to the present time."  (*Id.*)

## II.   Procedural Background

SSL filed the present suit against Jay and VGEC on July 14, 2021, raising causes of action for intentional interference with contractual relations, violation of the California Unfair Practices Act, conversion, and unfair competition in violation of the Lanham Act.  (Compl., ECF No. 1.)  Hussam had petitioned for bankruptcy, and his bankruptcy was ongoing at the time of the filing of the present action.  (*Id.* ¶¶ 48–49.)  On June 30, 2021, the United States Trustee ("Trustee") sued Hussam in United States Bankruptcy Court for the Southern District of California, objecting to Hussam's requested discharge and seeking to bar him from future bankruptcy filings.  (*Id.* ¶ 49; ECF No. 1-13.)

Defendants move to dismiss the action for lack of jurisdiction (ECF No. 6), which SSL opposes (ECF No. 13).  Defendants have filed a reply.  (ECF No. 16.)

Plaintiff moves for preliminary injunction that would bar Defendants from (1) operating the Restaurant in Miami; (2) using SHAWARMA STACKZ, THE

21cv1263

SHAWARMA STACKZ HOUSE, or any confusingly similar name, in connection with the operation of any restaurant or providing any related restaurant services; (3) possessing or making use of any SSL proprietary and/or confidential materials, including, inter alia, brand materials, recipes, and operational protocols; and (4) taking any action that would constitute a breach of SSL's Franchise Agreement with non-party Hussam Jawad. (ECF No. 7.) Defendants oppose the motion. (ECF No. 14.) Plaintiff filed a reply. (ECF No. 15.)

The Court held a hearing on the motions on November 22, 2021. The motions are now ripe for the Court's decision.

## MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

### I.   Legal Standard

#### A.   Federal Rule of Civil Procedure 12(b)(2)

When a defendant moves to dismiss an action for lack of personal jurisdiction, the plaintiff "bears the burden of establishing that jurisdiction is proper." *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008). "When a motion to dismiss is 'based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts.'" *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 978 (9th Cir. 2021) (omitting internal quotation marks) (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004)). The plaintiff "need only demonstrate facts that if true would support jurisdiction over the defendant." *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995) (citing *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977)).

"When considering a motion to dismiss for lack of personal jurisdiction, courts are not confined to the plaintiff's complaint; it is appropriate to consider evidence such as party declarations." *Frankie Valli & The Four Seasons v. EMI Music Publ'g Ltd.*, No. CV 17-7831-MWF (JCx), 2018 WL 6136818, at *3 (C.D. Cal. May 22, 2018). "Although the plaintiff cannot 'simply rest on the bare allegations of [his] complaint,' uncontroverted

allegations in the complaint must be taken as true." *Schwarzenegger*, 374 F.3d at 800 (quoting *Amba Mktg. Sys., Inc. v. Jobar Int'l, Inc.*, 551 F.2d 784, 787 (9th Cir. 1977)). Conflicts between statements in parties' affidavits must be resolved in the plaintiff's favor, *id.*, and courts "draw reasonable inferences from the complaint in favor of the plaintiff." *Fiore v. Walden*, 688 F.3d 558, 575 (9th Cir. 2012), *rev'd on other grounds*, 571 U.S. 277 (2014).  However, a court "may not assume the truth of allegations in a pleading which are contradicted by affidavit." *Data Disc*, 557 F.2d at 1284.

### B.    Personal Jurisdiction

"Where . . . there is no applicable federal statute governing personal jurisdiction, the district court applies the law of the state in which the district court sits." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1205 (9th Cir. 2006). "Because California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same." *Id.* (citing Cal. Civ. Proc. Code § 410.10).

Personal jurisdiction may be general or specific.  *Bristol-Myers Squibb Co. v. Sup. Ct. Cal., S.F. Cnty.*, 137 S. Ct. 1773, 1780 (2017).  "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile[.]" *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). "The paradigmatic locations where general jurisdiction is appropriate over a corporation are its place of incorporation and its principal place of business." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1069 (9th Cir. 2015). "Only in an 'exceptional case' will general jurisdiction be available anywhere else." *Id.* (quoting *Martinez v. Aero Caribbean*, 764 F.3d 1062, 1070 (9th Cir. 2014)).

If a defendant's activities in a state do not establish general jurisdiction, the defendant's contacts related to the cause of action may still subject the defendant to specific jurisdiction.  *Data Disc*, 557 F.2d at 1287.  The defendant must have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326

U.S. 310, 316 (1945).  The Ninth Circuit requires the following to establish minimum contacts for specific jurisdiction:

> (1) [t]he non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802.  The plaintiff bears the burden of satisfying the first two prongs of the test.  *Id.*  The burden then shifts to the defendant to show that jurisdiction would not be reasonable.  *Id.*

## II.     Analysis

### A.     General Jurisdiction

#### 1.     VGEC

Absent a showing of "exceptional" circumstances, VGEC is subject to general jurisdiction in its state of incorporation and its principal place of business.  *See Ranza*, 793 F.3d at 1069.  The Complaint alleges that VGEC was incorporated in Florida.  (Compl. ¶ 4.)  It does not state where VGEC has its principal place of business; it merely alleges that VGEC "has done business in San Diego County."  (*Id.*)  According to Defendants, VGEC has all of its operations in Florida and its officers, directors, and employees are in Florida.  (Jay Jwad Mot. Decl. ¶ 6, ECF No. 6-1.)  SSL does not contest the veracity of this statement.  The Court finds that VGEC's principal place of business is in Florida.  *See Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010) (holding that a corporation's "principal place of business" is in the "place where a corporation's officers direct, control, and coordinate the corporation's activities").  Because Florida is both the place of incorporation

and the principal place of business of VGEC, VGEC is not subject to general jurisdiction in California.

### 2. Jay Jwad

To establish general jurisdiction over Jay Jwad, SSL must show that Jay is domiciled in California. *See Goodyear*, 564 U.S. at 924. SSL's Complaint alleges that Jay is "an individual resident of the State of Florida," who "has physically visited San Diego County to conduct the business that is the subject of this Complaint." (Compl. ¶ 3.) While SSL submits evidence of a personal check for $10,000 made to Tahini signed by Jay on December 5, 2018, which bears an address in Chula Vista, California, SSL does not argue that Jay was domiciled in California or that he is subject to general jurisdiction there. (ECF No. 7-6.) Jay filed a declaration stating that he was never domiciled in California. (Jay Jwad Mot. Decl. ¶ 2 (stating that Jay "ha[s] never lived in California"), ECF No. 6-1.) The Court finds that Jay is not subject to general jurisdiction in California.

### B. Specific Jurisdiction

Having found that the facts available to the Court do not support exercising general jurisdiction, the Court next examines whether they support exercising specific jurisdiction over VGEC and/or Jay. For the following reasons, the Court finds sufficient basis to exercise specific jurisdiction over VGEC and Jay.

### 1. VGEC

#### a. Prong One: Purposeful Direction

SSL has the initial burden to make a *prima facie* case that VGEC's conduct directed at California constituted a purposeful direction or purposeful availment. Courts "generally apply the purposeful availment test when the underlying claims arise from a contract, and the purposeful direction test when they arise from alleged tortious conduct." *Schwarzenegger*, 374 F.3d at 802. SSL's causes of action include tort of intentional

interference with contractual relations, tort of conversion, unfair business practices in violation of California Business and Professions Code § 17200, and unfair competition in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a).  The state unfair business practices claim and the federal Lanham Act claim sound in tort.  *See Slaughter v. Van Cleve*, No. CV-07-6599 CAS (FFMx), 2007 WL 4357567, at *7 (C.D. Cal. Dec. 10, 2007) (Cal. Bus. & Prof. Code § 17200); *Sky Billiards, Inc. v. Loong Star Inc.*, No. EDCV 14-00921 JGB (SPx), 2014 WL 12601022, at *3 (C.D. Cal. Sept. 4, 2014) (the Lanham Act). Thus, the Court applies the purposeful direction test to weigh whether SSL has met its burden.

Courts evaluate purposeful direction under a three-part "effects" test. *Schwarzenegger*, 374 F.3d at 803 (citing *Calder v. Jones*, 465 U.S. 783 (1984)).  Under this test, a defendant must have "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Id.* (citation omitted).  "[A] 'mere injury to a forum resident is not a sufficient connection to the forum.'  Rather, 'an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State.'" *Sec. Alarm Fin. Enters., L.P. v. Nebel*, 200 F. Supp. 3d 976, 984 (N.D. Cal. 2016) (quoting *Picot*, 780 F.3d at 1213–14).

### i.    Intentional Act

SSL has shown that VGEC committed an intentional act.  A defendant makes an "intentional act" when the defendant "act[s] with the 'intent to perform an actual, physical act in the real world.'" *Picot*, 780 F.3d at 1214 (quoting *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1129 (9th Cir. 2010), *abrogated on other grounds by Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1070 (9th Cir. 2017)).  The allegations underlying SSL's causes of action are that VGEC gained access to SSL's franchise, confidential recipe, and know-how; VGEC assumed the Miami Restaurant's ownership

from Hussam; and VGEC operated the Restaurant while making unauthorized use of SSL's Marks.   These allegations are sufficient to show an intentional act.

### ii.   Express Aiming

The Court next analyzes whether VGEC "expressly aimed" the relevant intentional acts at California.  *See Picot*, 780 F.3d at 1214.  This analysis "varies from case to case and 'depends, to a significant degree, on the specific type of tort or other wrongful conduct at issue.'"  *Id.* (quoting *Schwarzenegger*, 374 F.3d at 807).  "Express aiming requires more than the defendant's awareness that the plaintiff it is alleged to have harmed resides in or has strong ties to the forum, because 'the plaintiff cannot be the only link between the defendant and the forum.'"  *Ayla*, 11 F.4th at 980 (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014).)  "[S]omething more—conduct directly targeting the forum—is required to confer personal jurisdiction."  *Id.*  (omitting internal quotation marks) (quoting *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1229 (9th Cir. 2011)).

Here, SSL's theory of subjecting VGEC to specific jurisdiction in California is that VGEC, through its Officer, Hussam Jawad, gained access to SSL's franchise and confidential recipe.  Among others, SSL alleges that Hussam, acting as VGEC's executive, frequented Tahini and approached Shabaik to negotiate the franchise agreement and solicit recipes from SSL.  The Court must determine, first, whether Hussam's acts can be imputed to VGEC, and second, if so, whether Hussam's acts were purposefully directed at California.

As an initial matter, the actions that Hussam undertook with apparent authority to act for VGEC can be imputed to VGEC.  "[A] corporation 'can only act through its employees and agents.'"  *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 475 (9th Cir. 2015).  "For purposes of personal jurisdiction, the actions of an agent are attributable to the principal."  *Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990).  In California and in Florida, an officer of a corporation is an agent of the corporation.  *See* Cal. Corp. Code § 317(a); *Tew v. Chase Manhattan Bank, N.A.*, 728 F. Supp. 1551, 1559 (S.D. Fla. 1990),

*amended on other grounds*, 741 F. Supp. 220 (S.D. Fla. 1990).   Further, a *prima facie* showing that an individual acted with apparent authority is enough to show that an agent's act was carried out on behalf of the principal.   *See Myers v. Bennett L. Offs.*, 238 F.3d 1068, 1073 (9th Cir. 2001) (imputing the acts of an agent to principal based on evidence that the agent had apparent authority to act on the principal's behalf).   Here, VGEC has made a *prima facie* showing that Hussam acted with apparent authority, through documents not contested by Defendants.   Those documents include: (1) an email from Hussam from his VGEC email address ("Sam Jawad <samjawad@visionglobalentertainment.com>") addressed to SSL ("Tahini <tahinistreetfood@gmail.com>"), listing three VGEC employees as part of "Tahini Miami project team" (ECF No. 13-8); and (2) an email from Hussam from his VGEC email address addressed to SSL that states: "Hi Osama [Shabaik], can you please put together list of the kitchen equipments [sic] we will need to purchase?" (ECF No. 7-18).   The second email's signature block provides Hussam's title as the chief operating officer of VGEC:

> Sam Jawad
> samjawad@visionglobalentertainment.com
> Chief Operating Officer
> Vision Global Entertainment & Management
> Bringing Dreams To Reality
> Dubai - Abu Dahbi- Miami
> US 001-610-241-4436
> Dubai 971-058-210-8126
> P.O. BOX 215321,2506
> Jumeirah BayTower X3,
> Jumeirah Lakesb Towers, Dubai UAE

(ECF No. 7-18.)   These documents are consistent with the declaration by SSL's owner, Osama Shabaik, that based on Hussam's representations, Shabaik believed that he "had been meeting with . . . a representative of VGEC" when he met with Hussam.   (Shabaik Decl. ¶ 13, ECF No. 13-2.)   SSL has shown that Hussam's actions can be attributed to VGEC for purposes of establishing personal jurisdiction.

Having so found, the Court next turns to analyze whether Hussam's conduct relevant to SSL's claims—namely, gaining access to SSL's franchise and confidential recipe—constitutes "conduct directly targeting the forum." *Ayla*, 11 F.4th at 980.  The Court finds that it does.  "[P]urposeful direction generally requires that the defendant 'reach[ ] out' into the forum state by, say, seeking to 'deliberately exploit a market [there]' or 'entering a contractual relationship that envisioned continuing and wide-reaching contacts in [that] State.'"  *Daoud v. Societe Generale De Banque Au Liban*, S.A.L., No. SACV 21-00335-CJC (KESx), 2021 WL 3579359, at *3 (C.D. Cal. July 6, 2021) (quoting *Walden*, 571 U.S. at 285).  SSL alleges that Hussam reached out into California by entering a ten-year-long franchise agreement that envisioned continuing contacts with SSL in California.  According to the Complaint, Hussam frequented the Tahini Restaurant in San Diego and solicited its owners, Shabaik and Barkawi, to open a Tahini-branded franchise restaurant in Miami, Florida.  (Compl. ¶ 9.)  It also alleges that Hussam participated in trainings provided by SSL in San Diego from April 22, 2020, to May 15, 2020.  (*Id.* ¶ 12.)  SSL highlights messages and emails Hussam sent to SSL's owners to solicit and negotiate the Franchise Agreement, which was to remain in effect for at least ten years after the Miami Restaurant first opened for business.  (*E.g.*, ECF Nos. 13-3, 13-4, 13-8, 13-10, 13-14, 13-15; *see* Agreement § 3.1, ECF No. 1-2 at 93.)

Based on the above, the Court finds that SSL has made a *prima facie* showing that Hussam's conduct, made under apparent authority of VGEC, is attributable to VGEC.  The Court also finds that the same conduct was expressly aimed at California.  Thus, the express aiming element is satisfied.

### iii.    Harm Likely to be Felt in the Forum State

Finally, SSL has shown that VGEC caused harm that it knows is likely to be suffered in California.  "[A] corporation can suffer economic harm both where the bad acts occurred and where the corporation has its principal place of business."  *Dole Food Co. v. Watts*, 303 F.3d 1104, 1113 (9th Cir. 2002).  SSL is a California corporation with its principal

place of business in California, and it was predictable to VGEC that SSL would sustain any injury in California.

In sum, all three requirements of the purposeful direction test are satisfied.

### b.   Prong Two: Claim's Nexus with Forum-related Activities

The second prong requires that Plaintiff's "claim[s] arise[] out of forum-related activities[.]" *Ballard*, 65 F.3d at 1500.  Courts in this circuit employ a "but for" test to weigh the second prong of the specific jurisdiction analysis and ask: but for the defendant's contacts with the forum state, would the plaintiff's claims have arisen? *Id.*  To satisfy this test, the defendant's conduct cannot be too far attenuated from the injuries.  *See Doe v. Am. Nat. Red Cross*, 112 F.3d 1048, 1051 (9th Cir. 1997).  For example, the Ninth Circuit held that an individual who contracted a communicable disease after receiving blood transfusion at an Arizona hospital could not establish personal jurisdiction over a federal official who was only tangentially involved in disseminating blood in Arizona because, among others, "[the official]'s relation to blood transfusions performed in Arizona [was] too far attenuated to satisfy the 'but for' test."  112 F.3d at 1051–52.

Here, SSL's claims arise out of VGEC's forum-related activities.  But for VGEC's solicitation and negotiation of the franchise business with SSL, SSL's confidential business methods and recipes would not have been provided to VGEC, and VGEC could not have misused them as alleged.  Therefore, the Court finds that SSL has shown that the nexus requirement of the specific jurisdiction analysis is satisfied.

### c.   Prong Three: Notions of Fair Play and Substantial Justice

The third prong of the specific jurisdiction analysis asks whether "[a] district court's exercise of jurisdiction over a nonresident defendant comports with due process." *Ayla*, 11 F.4th at 979.  VGEC bears the burden to show that exercising jurisdiction would not be reasonable.  *Schwarzenegger*, 374 F.3d at 802.  Exercising jurisdiction is deemed reasonable "when the defendant has at least 'minimum contacts' with the forum and

subjecting the defendant to an action in that forum would 'not offend traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l. Shoe Co.*, 326 U.S. at 316).  Courts balance the following seven factors:

> (1) the extent of the defendants' purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Caruth v. Int'l Psychoanalytical Ass'n*, 59 F.3d 126, 128 (9th Cir. 1995).

The first factor—the extent of VGEC's purposeful interjection into California's affairs—weighs in favor of exercising jurisdiction.  The Court finds instructive *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985), in which the Supreme Court held that the Florida district court reasonably exercised personal jurisdiction over an out-of-state franchisee, who solicited, negotiated, and entered into a franchise agreement in Florida. The Court reasoned:

> Eschewing the option of operating an independent local enterprise, [the franchisee] deliberately "reach[ed] out beyond" Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization.  Upon approval, he entered into a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida.  In light of [the franchisee's] voluntary acceptance of the long-term and exacting regulation of his business from Burger King's Miami headquarters, the "quality and nature" of his relationship to the company in Florida can in no sense be viewed as "random," "fortuitous," or "attenuated."  [The franchisee's] refusal to make the contractually required payments in Miami, and his continued use of Burger King's trademarks and confidential business information after his termination, caused foreseeable injuries to the corporation in Florida.  For these reasons it was, at the very least, presumptively reasonable for [the franchisee] to be called to account there for such injuries.

471 U.S. at 479–80 (citations omitted).  Here, too, VGEC, through its officer Hussam, reached out beyond its home state of Florida and negotiated with SSL, a California corporation, to purchase a ten-year franchise and the benefits that would flow from the franchise.  VGEC's contacts with California cannot be viewed as random, fortuitous, or attenuated.

The second factor—the burden on VGEC in defending in the forum—does not weigh against exercising jurisdiction.  The mere fact that VGEC is a nonresident and will be inconvenienced by litigating in California is not enough.  *See Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1323 (9th Cir. 1998), *modified on other grounds by Yahoo!*, 433 F.3d at 1199.  SSL posits that VGEC's officer, Hussam is already facing arbitration and bankruptcy proceedings in San Diego, which overlaps with the claims against VGEC in the present action.  VGEC has not made a showing that it faces an unusual burden to litigate this action in California.

The third factor—conflict with sovereignty of Florida—is not a concern in this case.  VGEC has not shown that the Court's analysis of SSL's state and federal claims would implicate sovereignty concerns of Florida.

The fourth factor—the forum state's interest in adjudicating the dispute—weighs in favor of exercising jurisdiction.  "A State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors."  *Burger King*, 471 U.S. at 473.  SSL is a California corporation, and California has a manifest interest in redressing injuries inflicted onto SSL by out-of-state actors.

The fifth factor—efficient judicial resolution of the controversy—is neutral.  "This factor focuses on the location of the evidence and witnesses."  *Panavision*, 141 F.3d at 1323.  The weight assigned to this factor is minimal, "given the modern advances in communication and transportation."  *Id.*  SSL is located in San Diego, and VGEC is in Florida.  Although parties do not list potential witnesses, Plaintiff's witnesses appear to consist of its shareholders Shabaik and Barkawi, who are in California, and VGEC's key

21cv1263

witnesses would likely be Jay and Hussam, who are in Florida.  VGEC has not shown that the location of evidence and witnesses favor one state over the other.

The sixth factor—convenient and effective relief for Plaintiff—weighs slightly in favor of exercising jurisdiction in California.  VGEC has not shown that the requested relief can be rendered in a more convenient and effective manner outside of California.  In any case, the Court assigns minimal weight to this factor.  *See Ziegler v. Indian River Cnty.*, 64 F.3d 470, 476 (9th Cir. 1995).

The seventh and final factor—existence of an alternative forum—weighs in favor of VGEC.  The record does not indicate that the alternative forum, Florida, is not available.  It may be more costly for SSL to litigate in Florida, but on its own "this is not an unreasonable burden."  *See Panavision*, 141 F.3d at 1324.

In balancing the seven factors, the Court concludes that VGEC has not shown that the Court's exercise of jurisdiction over VGEC does not comport with the traditional notions of fair play and substantial justice.

Because all three prongs for finding specific jurisdiction are satisfied, the Court **DENIES** Defendants' 12(b)(2) motion as to VGEC.

### 2.   Jay Jwad

The Court next considers whether Jay's personal contacts with California, including the contacts made as an officer of VGEC, are sufficient to justify the exercise of specific personal jurisdiction over him.  For the following reasons, the Court finds that all three prongs of establishing specific jurisdiction are satisfied.

#### a.   Prong One: Purposeful Direction
##### i.   Intentional Act

Jay committed an intentional act.  The allegations underlying SSL's causes of action are that Jay "conspire[d] with Hussam to use fraud to access SSL's proprietary recipe"; "purport[ed] to accept an ownership interest in the Restaurant"; and "conspir[ed] with

21cv1263

Hussam to operate the Restaurant through misuse of SSL's proprietary and confidential information, along with SSL's intellectual property." (Compl. ¶ 53.)   Additional allegations relevant to the remaining causes of action similarly go to the transfer of the Miami Restaurant's ownership from Hussam to Jay, the Miami Restaurant's unauthorized use of SSL's trademark, and the Miami Restaurant's ongoing operation.  (*Id.* ¶¶ 56–71.) Courts have found similar allegations of intentional use of intellectual property sufficient to satisfy the intentional act requirement.  *See, e.g., Luxul Tech. Inc. v. Nectarlux, LLC*, 78 F. Supp. 3d 1156, 1178 (N.D. Cal. 2015) (finding that the "intentional act" element was satisfied where the plaintiff alleged that the defendants intentionally used the plaintiff's trademarked materials).

### ii.   Express Aiming

The Court next analyzes whether Jay "expressly aimed" the relevant intentional acts at California.  *See Picot*, 780 F.3d at 1214.  Among others, SSL alleges that Jay was an active participant in negotiating the Franchise Agreement.  Shabaik's declaration filed in opposition of the present motion state that Jay and Shabaik "stayed in constant communication to discuss the restaurant buildout and restaurant operations over the phone and mail[,]" and that these discussions "also occurred in person in San Diego." (Shabaik Opp. Decl. ¶ 10, ECF No. 13-2.)  In another declaration filed in support of SSL's motion for preliminary injunction, Shabaik states that Jay signed the preliminary agreement between Tahini and VGEC. (Shabaik PI Decl. ¶¶ 5–6, ECF No. 7-2; *Id.* Ex. 3, ECF No. 7-5.) In addition, Shabaik alleges that Jay wrote a personal check to Tahini as partial payment under the Preliminary Agreement.  (Shabaik PI Decl. ¶ 6; *Id.* Ex. 4, ECF No. 7-6.)  Jay's own declaration disputes these allegations and states that he never visited California in connection with the franchise business.  (Jay Jwad Mot. Decl. ¶ 7.)  In another declaration, Jay also states that his signature on the Preliminary Agreement is not his.  (Jay Jwad PI Decl. ¶ 5.)  Where, as here, there are conflicts between statements in the parties' affidavits, a court construing a 12(b)(2) motion must resolve the conflict in the plaintiff's favor.

*Schwarzenegger*, 374 F.3d at 800.  Following that rule as the Court must, the Court finds that SSL has made a *prima facie* showing that Jay reached over state lines to negotiate the franchise business with SSL in California.  The Court finds that Jay's conduct was expressly aimed at California.

### iii.   Harm Likely to be Felt in the Forum State

SSL is a California corporation, and Jay does not dispute that it was foreseeable to him that SSL would sustain an injury in California.  To the extent that Jay's declaration states that he was not told that the Miami Restaurant would be a franchise or that he would be a franchisee (Jay Jwad PI Decl. ¶ 5, ECF No. 14-1), it is in conflict with Shabaik's declarations, which states that Jay was kept in the loop about the franchise negotiations by phone, email, and personal meetings (Shabaik Opp. Decl. ¶¶ 7–11; Shabaik PI Decl. ¶¶ 5, 8, 11, 13–16, 19).  Resolving the factual conflict in SSL's favor, *Schwarzenegger*, 374 F.3d at 800, the Court finds that SSL has made a *prima facie* showing that Jay knew the harm was likely to be suffered in California.

### b.   Prong Two: Claim's Nexus with Forum-related Activities

Having found that all three requirements of the purposeful direction test are satisfied, the Court turns to examine whether SSL's claims against Jay arise out of Jay's forum-related activities.  To satisfy this prong, SSL must make a *prima facie* showing that its claims would not have arisen but for Jay's forum-related conduct.  SSL has met this burden.  As alleged by SSL, Jay's forum-related conduct was essential in the culmination of the Franchise Agreement: including but not limited to signing the Preliminary Agreement on behalf of VGEC as its CEO (Shabaik PI Decl. ¶ 5) and writing a check worth $10,000 to Tahini as partial payment under the Preliminary Agreement (*id*. ¶ 6).  But for these and other forum-related conduct made by Jay, SSL's confidential business methods and recipes would not have been provided to Jay, and Jay could not have misused them as

alleged.  Therefore, the Court finds that SSL has made a *prima facie* showing of the nexus between its claims and Jay's activities directed at California.

### c.   Prong Three: Notions of Fair Play and Substantial Justice

Because SSL has carried its burden to satisfy the first two prongs, the burden passes to Jay to show that exercising jurisdiction would not be reasonable.  *Schwarzenegger*, 374 F.3d at 802.  Jay has not met that burden.  Jay argues that because he lives in Miami, defending himself in this action in California would be burdensome and that the material witnesses for the case are all located in Florida.  However, the mere fact that Jay is a nonresident and will be inconvenienced by litigating in California is not enough to show that the Court's jurisdiction over Jay would not comport with notions of fair play and substantial justice.  *See Panavision*, 141 F.3d at 1323.  In addition, the location of witnesses is given only minimal weight "given the modern advances in communication and transportation."  *Id*.  In any case, Jay has not shown that the location of evidence and witnesses favor one state over the other, given that SSL and its owners are located in California.  Other factors relevant to the reasonableness analysis weigh in favor of exercising jurisdiction, for the same reasons applicable to VGEC.  *See supra* Part II.B.1.c.

Because all three prongs required to establish specific jurisdiction are satisfied as to both Defendants, the Court **DENIES** Defendants' 12(b)(2) motion.

## MOTION FOR PRELIMINARY INJUNCTION

### I.   Legal Standard

The purpose of preliminary relief "is to preserve the status quo between the parties pending a resolution of a case on the merits."  *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012) (citing *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010)).  To obtain a preliminary injunction, SSL must satisfy one of two sets of criteria.  Under the traditional, four-factor *Winter* test, SSL must establish that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of

preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776 (9th Cir. 2011) (holding that a plaintiff seeking preliminary injunction "must demonstrate that it meets all four of the elements of the preliminary injunction test").   Alternatively, SSL may "demonstrate[] *either* a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor." *Earth Island Inst. V. U.S. Forest Serv.*, 351 F.3d 1291, 1298 (9th Cir. 2003) (quoting *Johnson v. Cal. State Bd. of Accountancy*, 72 F.3d 1427, 1430 (9th Cir. 1995).)

In appraising SSL's claims for the purposes of granting or denying preliminary injunction, "[the court's] function is not to make an original judgment or to make a final decision on the merits."  *Sierra Club v. Hickel,* 433 F.2d 24, 33–34 (9th Cir. 1970), *aff'd*, *Sierra Club v. Morton*, 405 U.S. 727 (1972).  "[P]laintiff[] seeking a preliminary injunction face[s] a difficult task in proving that they are entitled to this 'extraordinary remedy.'" *Earth Island Inst. V. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (quoting *Winter*, 555 U.S. at 22).

## II.    Analysis

### A.    Likelihood of Success on the Merits

To satisfy the likelihood of success factor,  SSL must establish that it will prevail on the merits at a final hearing with a "reasonable certainty."  *Sierra Club,* 433 F.2d at 33; *Williams*, 340 F. Supp. at 450.[2]  "While [the movants] carry the burden of demonstrating likelihood of success, they are not required to prove their case in full at this stage but only such portions that enable them to obtain the injunctive relief they seek."  *Doe v. McAleenan*,

---

[2] Because SSL meets the higher burden of proof attached to the traditional, *Winter* four-factor test, the Court does not apply the "sliding scale" approach, which lessens the movant's burden of proof.

- 24 -

415 F. Supp. 3d 971, 977 (S.D. Cal. 2019), *modified*, No. 19CV2119 DMS AGS, 2019 WL 6605882 (S.D. Cal. Dec. 3, 2019).

### 1.    Infringement of Unregistered Mark

SSL seeks to hold Defendants liable for infringing its unregistered mark in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  Section 43(a) provides a cause of action for "any person who believes that he or she is or is likely to be damaged by [an infringing] act" to hold liable in a civil action against anyone "who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact," where such use "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person[.]"  15 U.S.C. § 1125(a)(1).

### a.    Statutory Authorization to Sue

Defendants argue that SSL lacks standing to bring a federal trademark infringement claim under the Lanham Act.  "On its face, section 43(a) gives standing to sue to 'any person who believes that he is or is likely to be damaged.'"  *Smith v. Montoro*, 648 F.2d 602, 607 (9th Cir. 1981).  This "standing" is not jurisdictional; rather, it is a question of whether the plaintiff has a valid cause of action.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014).  Thus, the first inquiry on whether SSL's claim is likely to succeed on its merits is whether SSL is a party that is or is likely to be injured by Defendants' alleged conduct and is thus statutorily authorized to sue under Section 43 of the Lanham Act.  The Supreme Court in *Lexmark* has set forth a two-part test to determine whether a plaintiff bringing a Section 43(a) claim is an authorized party: first, "[the] plaintiff must allege an injury to a commercial interest in reputation or sales" to

establish that the plaintiff is "within the zone of interests" in the suit; and second, the injury must be "proximately caused by violations of the statute." *Lexmark*, 572 U.S. at 131–32. SSL has shown that it is statutorily authorized to bring the Section 43(a) claim against Defendants.

### i.     Zone of Interests

To discern what injury comes within the zone of interests relevant to a Section 43(a) claim, the *Lexmark* Court looked to the Congressional statement of intent for the Lanham Act, which lists the following five separate statutory objectives: (1) "making actionable the deceptive and misleading use of marks in such [interstate and foreign] commerce"; (2) "to protect registered marks used in such commerce from interference by State, or territorial legislation"; (3) "to protect persons engaged in such commerce against unfair competition"; (4) "to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks"; and (5) "to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations." *Lexmark*, 572 U.S. at 131 (quoting 15 U.S.C. § 1127).  "[I]t is common ground that § 43(a) protects qualifying unregistered trademarks[.]" *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).  A plaintiff who owns an unregistered mark satisfies the congressional objectives (1) and (3) and thus satisfies the zone of interest requirement.  *See* McCarthy, Trademarks and Unfair Competition, § 21:3.50 (5th ed. Sep. 2021 Update).

Courts have recognized that parties who own an unregistered mark or who does not own the mark but has a "cognizable interest" in the mark are authorized to bring suit under the Lanham Act.  *Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1225 (9th Cir. 2008).  In *Halicki Films*, the plaintiff argued that her prior use made her an owner of the trademark at issue or, in the alternative, she had "standing because her royalty interest in the sale of [the] products provide[d] her with a commercial interest in the . . . mark." *Id.* at 1227.  Based on these facts, the Ninth Circuit remanded for the district court

to determine whether the plaintiff had established ownership of the mark through prior use, and if not, "then consider [the plaintiff's] argument that she is a non-owner with a 'commercial interest in the allegedly misused mark that is likely to be damaged.'" *Id.*

Here, Tahini, which is the parent company of SSL, owns the "Shawarma Stackz" trade name, trademarks, service marks, logos, and related trade dress (the "Marks"). (Agreement at 1, ECF No. 7-3 at 8.)  Tahini has licensed the Marks to SSL.  (*Id.*)  SSL, in turn, entered into the Agreement with Hussam, allowing him to establish a Shawarma Stackz restaurant in Miami.  (*Id.* at 4, ECF No. 7-3 at 11.)  SSL submits a declaration by its owner, Shabaik, that SSL "has a franchise agreement with another franchisee, and expects to open a new Shawarma Stackz-branded restaurant in Northern California in the next several months." (Shabaik Decl. ¶ 54, ECF No. 7-2.)  In the same declaration, Shabaik submits that "SSL's new franchisee is nearing completion of construction on its franchised restaurant."  (*Id.*)  SSL has shown that it is likely to establish a cognizable commercial interest in the Marks that places it within the zone of interests protected by the Lanham Act.

Defendants do not argue that Tahini owns the Marks.  They argue instead that SSL is not authorized to bring a Lanham Act claim because: (1) it is Tahini, and not SSL, who applied to register the Marks; (2) SSL is not using the mark in commerce because there is no other restaurant operating under the "Shawarma Stackz" brand; and (3) Tahini's application to register the Marks with the United States Patent and Trademark Office ("USPTO")  was rejected, and Tahini subsequently abandoned its attempt.  These arguments lack persuasion.  SSL brings the Lanham Act claim under Section 43(a), which protects unregistered marks. *See Two Pesos, Inc.*, 505 U.S. at 768.  Because SSL's Section 43(a) claim challenges Defendants' alleged infringement of unregistered marks, the fact that SSL did not register the Marks is irrelevant.

Instead, SSL need only establish that it is a party with a cognizable interest in the Marks.  *Halicki Films*, 547 F.3d at 1225.  The Court finds no support for Defendants' position that SSL cannot establish a cognizable commercial interest in the Marks unless a

- 27 -

restaurant other than Defendants' is in operation.  The Agreement provides that SSL is a licensee of the Marks.  (Agreement at 1.)  SSL submits preliminary proof that it is actively expanding the franchise and has entered into a franchise agreement with a new franchisee. (Shabaik Decl. ¶ 54.)  SSL argues that without an injunction, it will suffer reputational harm to its Shawarma Stackz brand, including "the franchisor's credibility in the eyes of other existing franchisees."  (Pl.'s Mem. at 24, ECF No. 7-1.)  "Reputational harm of this sort falls squarely within the *Lexmark* test."  *Knature Co. v. Duc Heung Grp., Inc.*, No. CV203877DMGAFMX, 2021 WL 2548679, at *6 (C.D. Cal. Apr. 22, 2021) (finding that the plaintiff, a nonowner of trademark, was authorized to bring suit under Section 43(a) because while the plaintiff "may not own the [claimed] trademarks, its business still has a commercial interest in the brand's reputation as an entity that markets and sells branded products").  SSL is likely to establish that it is a party within the zone of interests required to bring a Section 43(a) claim under the Lanham Act.

### ii.    Proximate Causation

The proximate-cause requirement is met where "the harm alleged has a sufficiently close connection to the conduct the statute prohibits."  *Lexmark*, 572 U.S. at 133.  SSL alleges that, without an injunction, it will sustain damage to the Shawarma Stackz franchise's goodwill because of Defendants' use of the Marks and their knockoff versions in commerce that violates Section 43(a).  SSL is likely to show that its alleged harm has a sufficient nexus with Defendants' alleged, infringing conduct.  The proximate cause requirement is thus satisfied.

In sum, SSL has shown that it is statutorily authorized to bring a trademark infringement claim under Section 43(a) of the Lanham Act.

### b.    Elements of a Section 43(a) Claim

The Court next turns to determine whether SSL is likely to meet the elements of its Section 43(a) claim.  To do so, SSL must show that it has a "valid, protectable trademark."

*Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 873 (9th Cir. 1999).  For Defendants to be held liable for infringement of such valid, protectable trademark, they must have "(1) use[d] in commerce (2) any word, false designation of origin, false or misleading description, or representation of fact, which (3) is likely to cause confusion or misrepresents the characteristics of his or another person's goods or services." *Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 902 (9th Cir. 2007).  For the following reasons, the Court finds that SSL is likely to prevail on the merits of its trademark infringement claim brought under Section 43(a) of the Lanham Act.

### i.       Valid, Protectable Trademark

Defendants argue that SSL's Marks are not valid or protectable.  Because a presumption of validity does not apply to unregistered marks, a plaintiff raising a trademark infringement claim over unregistered marks bears the burden of establishing that the marks are valid where, as here, a defendant challenges the validity of the marks.  *See Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 928 (9th Cir. 2005).

The same substantive law applies to adjudge the infringement of registered and unregistered marks.  McCarthy, *supra* at § 27:18.  Whether a given mark should be given legal protection depends on the mark's distinctiveness.  *See Two Pesos*, 505 U.S. at 768.  The Ninth Circuit recognizes four levels of distinctiveness of a trademark: "(1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary and fanciful." *Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*, 198 F.3d 1143, 1147 (9th Cir. 1999)  (citing *Surgicenters of Am., Inc. v. Med. Dental Surgeries Co.*, 601 F.2d 1011, 1014 (9th Cir. 1979)).

The first two categories, "generic" and "descriptive," are weaker marks.  A generic mark "refers to the genus of which the particular product or service is a species.  It cannot become a trademark under any circumstances." *Id.* (quoting *Surgicenters*, 601 F.2d at 1014).  "Descriptive marks define qualities or characteristics of a product in a straightforward way that requires no exercise of the imagination to be understood."

21cv1263

*Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1141–42 (9th Cir. 2002). "A descriptive term, unlike a generic term, can be a subject for trademark protection . . . provided that it has acquired 'secondary meaning' in the minds of consumers, i.e., it has 'become distinctive of the . . . goods [or services] in commerce.'" *Id.* (quoting *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 10 (2d Cir. 1976)).

"The two final categories, 'suggestive' and 'arbitrary and fanciful' marks, enjoy trademark protection as "inherently distinctive." *Computer Access Tech. Corp. v. Catalyst Enterprises, Inc.*, No. C-00-4852-DLJ, 2001 WL 34118030, at *4 (N.D. Cal. June 13, 2001) (citing *Int'l Jensen, Inc. v. Metrosound U.S.A.*, 4 F.3d 819, 824 (9th Cir. 1993)). "A suggestive mark is one for which 'a consumer must use imagination or any type of multistage reasoning to understand the mark's significance, . . . the mark does not describe the product's features, but suggests them.'" *Entrepreneur Media*, 279 F.3d at 1142 (quoting *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 n.8 (9th Cir. 1998)); *see also JL Beverage Co. v. Jim Beam Brands Co.*, 828 F.3d 1098, 1107 (9th Cir. 2016) (holding that suggestive marks "suggest a product's features and require consumers to exercise some imagination to associate the suggestive mark with the product"). "Arbitrary and fanciful marks . . . employ words and phrases with no commonly understood connection to the product." *JL Beverage*, 828 F.3d at 1107.

Here, the question is whether the "SHAWARMA STACKZ" Mark is suggestive or descriptive. According to SSL, "SHAWARMA STACKZ is used for restaurant services featuring Middle Eastern dishes, some of which include various types of shawarma, or thinly sliced meats," (Pl.'s Mem. at 15, ECF No. 7-1.) SSL argues that SHAWARMA STACKZ is suggestive because it refers to an ingredient of Middle Eastern dishes but does not immediately call to mind any specific dish. (*Id.* at 15–16.) Defendants argue that it is at best descriptive because shawarma "is a generic descriptive term for Mediterranean food." (Defs.' Opp'n at 15–16.)

The Court finds that SSL is likely to establish that the "SHAWARMA STACKZ" mark—used as a name for a Middle Eastern restaurant that sells shawarma wraps and other

Mediterranean-themed dishes including falafel, salad, and fries—is protectable as a suggestive mark.   To determine the strength of the mark, Courts look to the goods or services that it identifies.   *Entrepreneur Media*, 279 F.3d at 1142.   "Factors the Ninth Circuit has highlighted in distinguishing between the two types of marks [(descriptive or suggestive)] include the immediacy of the thought process to the particular product and whether others have used or desired to use the mark to describe the product."   *Sinhdarella, Inc. v. Vu*, No. C 07-04353 WHA, 2008 WL 410246, at *3 (N.D. Cal. Feb. 12, 2008).   For example, a court in this circuit has found the mark "The Boiling Crab," used as a name for a seafood restaurant, to be suggestive because that name "required some creativity and imagination, meaning significant steps were taken in order to go from the name of a seafood restaurant to the name in question."   *Id.*   In another example, a court found that the mark "TIE RAK," as a name for a store selling neckwear such as ties and accessories was suggestive and entitled to protection without proof of secondary meaning.   *Capitol Tie Rak, Inc. v. Tie Rack Stores of Illinois, Inc.*, No. 63 C 1380, 1966 WL 7642, at *2 (N.D. Ill. June 30, 1966) (finding that the mark would have been descriptive if "plaintiffs were selling tie racks rather than neckwear, or if the trademark were merely The Tie Store").   Here, too, although shawarma is an ingredient in some of the dishes sold in SSL's restaurants, the mark "SHAWARMA STACKZ" requires some imagination for a person to link that mark to the name of a Middle Eastern restaurant that sells various Middle Eastern dishes.   The trademark is distinguishable from merely descriptive terms such as The Shawarma Store, for example.   *See Capitol Tie Rak*, 1966 WL 7642, at *2.

Defendants argue that SSL's Marks are merely descriptive, relying on the decision by an examiner of the USPTO who denied SSL's trademark registration application.   (*See* ECF No. 14-4.)   Defendants were not party thereto.   In this circuit, courts have given such *ex parte* determination little to no weight because, among others, the determination is "made at its lowest administrative level" and without the benefit of "great mass of evidence which the parties have since presented to [the court]."   *See Carter-Wallace, Inc. v. Procter*

*& Gamble Co.*, 434 F.2d 794, 802 (9th Cir. 1970).  Here, too, the Court gives the USPTO's *ex parte* decision little to no weight.

Therefore, the Court finds it likely that Plaintiffs would succeed in establishing that it has a cognizable interest in valid, protectable Marks to pursue a trademark infringement claim under Section 43(a) of the Lanham Act.

### ii.       Use of the Mark in Commerce in Connection with Goods or Services

The parties do not dispute that Defendants' use constitutes one in commerce. Section 45 of the Lanham Act, 15 U.S.C. § 1127, defines the word "commerce" as used in the Lanham Act to include "all commerce which may lawfully be regulated by Congress." It is well settled that "commerce" includes intrastate commerce which "affects" interstate commerce.  *Thompson Tank & Mfg. Co. v. Thompson*, 693 F.2d 991, 993 (9th Cir. 1982). Here, this element is satisfied in two aspects.   First, even local, small-scale acts of infringement can affect interstate commerce in the franchise context.  *See Franchised Stores of N.Y., Inc. v. Winter*, 394 F.2d 664, 670 (2d Cir. 1968) (holding that unauthorized use of the protected marks in local stores can have an adverse effect on the entire franchise chain); *see also Gen. Elec. Co. v. Speicher*, 877 F.2d 531, 537 (7th Cir. 1989) ("Small local businessmen . . . do not have a license to steal trademarks from large non-resident corporations, and the amount of harm that the infringer inflicts goes to the amount of damages rather than to his liability for damages; the trademark laws do not excuse modest infringements by petty pirates.")  Second, communications made on public websites are made in interstate commerce.  *Nat'l Grange of the Ord. of Patrons of Husbandry v. Cal. Guild*, 334 F. Supp. 3d 1057, 1065 (E.D. Cal. 2018) (citing *United States v. Sutcliffe*, 505 F.3d 944, 952–53 (9th Cir. 2007)).  Here, SSL submits proof that Defendants used the Marks on its public website.  (Shabaik Decl. ¶ 46, ECF No. 7-2; *id.* Ex. 40, ECF No. 7-42.) For the foregoing reasons, the Court finds that SSL has shown that it is likely to meet the use in commerce element of its Section 43(a) claim.

### iii.    Likelihood of Causing Confusion

Likelihood of confusion is a "core element of trademark infringement[.]" *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1053 (9th Cir. 1999) (quoting *Off. Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1391 (9th Cir. 1993)).   Courts employ eight nonexclusive factors to evaluate the likelihood of confusion.  *Freecycle Network*, 505 F.3d at 903 (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979)).   These factors are "(1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines." *Id.*, 505 F.3d at 903 n.5.

Strength of the Marks.   As the Court has found above, SSL's Marks are likely to be found as suggestive, which are inherently distinctive and hold at least a moderate degree of strength. *See supra* Part II.A.1.b.i.; *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992).   Therefore, this factor weighs in favor of finding likely confusion.

Relatedness of the goods or services.   Goods or services are interrelated where the consumers would reasonably think that they "come from the same source if sold under the same mark." *Sleekcraft Boats*, 599 F.2d at 348 n. 10.  Here, SSL has submitted proof that the dishes offered by the Miami Restaurant are nearly identical to the Shawarma Stackz menu.  (*Compare* ECF No. 1-11 (Shawarma Stackz original menu) *with* ECF Nos. 7-42 (Miami Restaurant Aug. 2020 menu) *and* 7-61 (Miami Restaurant Aug. 2021 menu)).  Both parties' menus call appetizers "Munchiez," and include same dishes with identical names and descriptions: e.g., falafel, "halloumi cheese stix," hummus bowl, and "stackz fries." (*Compare* ECF No. 1-11 *with* ECF No. 7-61.)   Both parties' menus list their signature dishes under the name, "Stackz Originalz," which include the same chicken shawarma dish named "the Esquire" and a steak shawarma called "the O.G. Pita," as well as a rice bowl with feta cheese each named "the Fettah Bowl" and "the Fetahh Bowl."  (*Compare* ECF No. 1-11 *with* ECF No. 7-61.)  Defendants do not dispute that their Miami restaurant offers

goods and services as a "fast-casual restaurant serving shawarma and similar food items," similar to the Shawarma Stackz franchise concept.  (*See* Jay Jwad Decl. ¶ 4, ECF No. 14-1.)

Based on the above, the Court finds that SSL has presented sufficient evidence to demonstrate that it will likely succeed in establishing a high degree of relatedness between the dishes served by Defendants' Miami Restaurant and a Shawarma Stackz franchise restaurant.  It is reasonable for a consumer to think that the products come from the same source if sold under the same mark.  This factor weighs in favor of finding likely confusion.

Similarity of the marks.  To weigh the degree of similarity between the marks at issue, courts in this circuit follow three principles: (1) "Marks should be considered in their entirety and as they appear in the marketplace"; (2) "Similarity is best adjudged by appearance, sound, and meaning"; and (3) "Similarities weigh more heavily than differences."  *Entrepreneur Media*, 279 F.3d at 1144.

Here, SSL argues that the Miami Restaurant's name, logo, and menu, as they currently stand, infringe upon the Shawarma Stackz Marks.  SSL submits evidence that Defendants renamed the Miami Restaurant to "THE STACKZ SHAWARMA HOUZE," after initially operating the restaurant as "SHAWARMA STACKZ."  The two names are similar in sound and meaning.  Defendants have also tweaked the logo, signage, and menu design after renaming the Miami Restaurant.  As summarized in the following table, the appearance of the logos, signages, and menus—when considered in their entirety—exhibit a high degree of similarity.

| | SSL Marks | Miami Restaurant Marks |
|---|---|---|
| **Logo** |  |  |
| **Signage** |  |  |

21cv1263

| SSL Marks | Miami Restaurant Marks |
|---|---|
| Menu |  |

The Court finds that SSL is likely to succeed in establishing the similarity between its Marks and Defendants' allegedly infringing marks.  This factor weighs in favor of finding likely confusion.

Evidence of actual confusion.  SSL does not submit evidence of actual confusion. Although evidence of actual confusion can be persuasive proof of future confusion, "[p]roving actual confusion is difficult," and "the courts have often discounted such evidence because it was unclear or insubstantial." *Sleekcraft Boats*, 599 F.2d at 352. Because of the difficulty in proving actual confusion, "the failure to prove instances of actual confusion is not dispositive." *Id.* at 353.  This factor does not weigh in favor of finding likely confusion.

Marketing channels used.  "Convergent marketing channels increase the likelihood of confusion." *Sleekcraft Boats*, 599 F.2d at 353.  Courts consider "whether both parties 'use the Web as a *substantial* marketing and advertising channel,'" "whether the parties' marks 'are utilized in conjunction with Web-based products,'" and "whether the parties' marketing channels overlap in any other way." *Entrepreneur Media*, 279 F.3d at 1151 (quoting *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000) and

21cv1263

*Brookfield*, 174 F.3d at 1057). Here, SSL argues that Defendants use the same marketing channels as SSL, which include online advertising on Instagram and take-out delivery platforms: Toast, GrubHub, and UberEats.  The Court agrees that a consumer searching online for Shawarma Stackz can confuse it with Defendants' Miami Restaurant.  This factor weighs in favor of finding likely confusion.

<u>Degree of care likely to be exercised by the purchaser.</u>  "[W]hen dealing with inexpensive products, customers are likely to exercise less care, thus making confusion more likely." *Brookfield*, 174 F.3d at 1060.  Both the Miami Restaurant and the Shawarma Stackz franchise offer relatively low-priced foods and cater to customers seeking casual dining or takeout meals.  (*See* Jay Jwad Decl. ¶ 4, ECF No. 14-1.)  As such, the Court finds that the customers are likely to exercise less care.  This factor weighs in favor of finding likely confusion.

<u>Defendants' intent in selecting the Marks.</u>  "[I]f an infringer 'adopts his designation with the intent of deriving benefit from the reputation of the trade-mark or trade name, its intent may be sufficient to justify the inference that there are confusing similarities.'" *Brookfield*, 174 F.3d at 1059 (quoting *Pacific Telesis v. International Telesis Comms.*, 994 F.2d 1364, 1369 (9th Cir. 1993)).  "This factor favors the plaintiff where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark." *Id.*  Here, SSL has submitted evidence that Defendants had knowledge of SSL's Marks.  Namely, Defendant Jay Jwad was carbon copied (cc'ed) on several emails discussing the Miami Restaurant, several of which were sent from a VGEC email address. (Shabaik Decl. ¶¶ 4, 11, 13, 15, 19; id. Ex. 2, ECF No. 7-4; id. Ex. 11, ECF No. 7-13; id. Ex. 15, ECF No. 7-17; id. Ex. 17, ECF No. 7-19; id. Ex. 23, ECF No. 7-25.)  SSL also submits evidence that Jay himself sent out emails to SSL's owners regarding the development of the Miami Restaurant.  (*Id.* Ex. 12, ECF No. 7-14; *id.* Ex. 20, ECF No. 7-22.)  Based on this showing, the Court finds that SSL is likely to show that Defendants used the Marks knowing SSL's interests in the Marks.  This factor weighs in favor of finding likely confusion.

Likelihood of expansion.  "[A] 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Sleekcraft Boats*, 599 F.2d at 354.  In addition, "[w]hen goods are closely related, any expansion is likely to result in direct competition." *Id.*  SSL has submitted screenshots of Jay's social media posts, in which he announces that he intends to expand the "Stackz" brand to other product lines, including "Stackz Coffee" and "Stackz falafel." (Shabaik Decl. ¶¶ 49–50, ECF No.  7-2; *id.* Ex. 47, ECF No. 7-49; *id.* Ex. 53, ECF No. 7-55.)  The Court finds that this factor slightly weighs in favor of finding likely confusion.

The overall factors taken together, and in context, support a finding of likely confusion.

SSL has shown that it is likely to succeed on the merits of its Lanham Act claim.

## 2.    California Unfair Competition Law

California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 broadly prohibits unfair business practices. *See Allied Grape Growers v. Bronco Wine Co.*, 203 Cal. App. 3d 432, 451 (Ct. App. 1988), *as modified on denial of reh'g* (Aug. 26, 1988). It makes independently actionable violations of other laws, such as the Lanham Act.  *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003) ("Section 17200 'borrows' violations from other laws by making them independently actionable as unfair competitive practices.")  Establishing the elements of a Section 43(a) claim under the Lanham Act is sufficient to establish liability under the California UCL claim.  *See Phillip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1072 (C.D. Cal. 2004).

Having found that SSL is likely to succeed on the merits of its Lanham Act claim, the Court finds that SSL is also likely to succeed on the merits of the California UCL claim.

//

//

//

//

- 38 -

21cv1263

### 3.   Remaining State Torts Claims

The Court need not reach the merits of the remaining state torts claims that SSL raises because the Lanham Act claim and the UCL claim are sufficient to sustain a preliminary injunction.  The Court thus turns to the remaining factors of the preliminary injunction analysis.

### B.   Irreparable Harm in the Absence of Preliminary Relief

SSL has established that it will suffer irreparable harm in the absence of preliminary relief.  Where, as here, a movant establishes that it is likely to prevail on its trademark infringement claim, courts have found that "unless [the p]laintiff is allowed to protect its marks, its ability to control its reputation and goodwill associated with the marks will be significantly reduced."  *Wetzel's Pretzels, LLC v. Johnson*, 797 F. Supp. 2d 1020, 1028 (C.D. Cal. 2011).  The Lanham Act itself provides that a plaintiff seeking injunction to prevent a violation of Section 43(a) "shall be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction[.]"  15 U.S.C. § 1116(a).

Defendants have not rebutted the presumption of irreparable harm.  They argue that SSL is not using its mark in commerce, but SSL submits evidence that SSL has a franchise agreement with another franchisee and expects to open a new franchise restaurant in Northern California, pending the completion of construction.  (Shabaik Decl. ¶ 54, ECF No. 7-2.)  At this stage of the litigation, the Court finds that the presumption of irreparable harm is preserved.

### C.   Balance of Hardships

SSL argues that Defendants' alleged, continued use of its Marks harms the goodwill of the franchise and jeopardizes its investment in the franchise.  Defendants argue that if an injunction is granted, they will be forced to cease operating the Restaurant, which will

21cv1263

result in substantial loss of revenue and lost jobs for employees during an ongoing pandemic.  (Defs.' Opp'n at 25.)  However, Defendants' asserted hardship is self-imposed, in the sense that "it is Defendants who brought on those risks" by engaging in potentially infringing conduct.  *See Wetzel's Pretzels*, 797 F. Supp. 2d at 1029.

The Court finds that the balance of hardships tips in SSL's favor.

### D.    Public Interest

"In the trademark context, courts often define the public interest at stake as the right of the public not to be deceived or confused."  *CytoSport, Inc. v. Vital Pharms., Inc.*, 617 F. Supp. 2d 1051, 1081 (E.D. Cal. 2009), *aff'd*, 348 F. App'x 288 (9th Cir. 2009).  "[T]he public has a strong interest in being free from the confusion caused by unauthorized use of [the protected] marks."  *Wetzel's Pretzels*, 797 F. Supp. 2d at 1029.

The Court finds that the public interest is in favor of granting the requested preliminary injunction.

### E.    Preliminary Injunction Bond

Under Federal Rule of Civil Procedure 65(c), a party moving for preliminary injunction must post security bond "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Whether to require the security bond and how much the amount should be is within the district court's discretion.  *See Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011).  At oral argument, the Court ordered the parties to submit supplemental briefs on the amount of the security bonds, and the parties have submitted their briefs and supporting documents.  (ECF Nos. 21, 22, 23.)  Upon considering the parties' papers and other evidence in the record, the Court finds that a bond of $20,000 is appropriate.

//

//

//

21cv1263

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**F.     Stay Pending Interlocutory Appeal**

At oral argument, Defendants moved for a stay preventing enforcement of an injunction order pending interlocutory appeal of a preliminary injunction order.

This Court has discretion to stay the case pending interlocutory appeal. *See Nken v. Holder*, 556 U.S. 418, 433 (2009) (holding that "[a] stay is not a matter of right, even if irreparable injury might otherwise result" and that "[t]he propriety of its issue is dependent upon the circumstances of the particular case"); *Doe #1 v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken*, 556 U.S. at 433–34. To adjudge whether to stay the preliminary injunction, courts consider "(1) whether the [party moving to stay the injunction] has made a strong showing of the likelihood of success on the merits; (2) whether [that movant] will be irreparably injured absent a stay; (3) whether a stay will substantially injure other parties; and (4) where the public interest lies." *Doe #1*, 957 F.3d at 1058. Because the first two factors are the most critical, courts need not reach the last two factors if the first two factors are not satisfied. *Id.*

Defendants have not met their burden to establish irreparable harm absent a stay. "In the context of a stay request, 'simply showing some possibility of irreparable injury' is insufficient." *Doe #1*, 957 F.3d at 1058–59. Namely, Defendants have not demonstrated that the security bond cannot redress the damages they will sustain absent a stay, if the injunction were to be reversed as a result of the appeal.

In addition, Defendants have not made a strong showing that they are likely to succeed in appealing the preliminary injunction order. As fully discussed above, Plaintiffs have demonstrated that, with a reasonable certainty, they will prevail on the merits of their Lanham Act claim as well as the California UCL claim at a final hearing. *See supra* Part II.A. The Court has also found that Plaintiffs will sustain irreparable harm absent an injunction, and that the public interest and balance of hardship favor granting the injunctive relief. Thus, Defendants are not likely to succeed on the merits of their appeal.

21cv1263

Having found that the two most critical factors weigh against issuing a stay pending appeal, the Court **DENIES** Defendants' motion to stay the enforcement of the preliminary injunction order.

## CONCLUSION

For the above reasons, the Court **DENIES** Defendants' Rule 12(b)(2) motion to dismiss.  (ECF No. 6.)  Therefore, Defendants are **ORDERED** to file an answer to the Complaint **on or before January 7, 2022**.

The Court **GRANTS** Plaintiff's motion for preliminary injunction.  (ECF No. 7.) The Court hereby enjoins Defendants from: (1) operating the Miami Restaurant located on 241 NW 24th St, Miami, FL 33127; (2) using SHAWARMA STACKZ, THE SHAWARMA STACKZ HOUSE, or any confusingly similar name, in connection with the operation of any restaurant or providing any related restaurant services; (3) possessing or making use of any of SSL's proprietary and/or confidential materials, including, inter alia, brand materials, recipes, and operational protocols; and (4) taking any action that would constitute a breach of SSL's Franchise Agreement with non-party Hussam Jawad.

This injunction will go into effect upon SSL's posting of a bond in the amount of $20,000, and thereafter will remain in force until final judgment is entered in this case or until otherwise ordered by the Court.

**IT IS SO ORDERED.**

**DATED: December 8, 2021**

Hon. Cynthia Bashant
United States District Judge

- 42 -